IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FREIGHT TRAIN ADVERTISING, LLC | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 2803 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CHICAGO RAIL LINK, L.L.C. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Freight Train Advertising, LLC ("FTA") and Chicago Rail Link, L.L.C. ("CRL") contracted to erect and display advertising space on a train car that would sit on a track on a bridge over a busy Chicago expressway. Both parties chose not to fully explore the legality of the project before expending money on it and now each seeks to blame the other for the removal of the train car sign at the direction of local officials who deemed it to be a violation of the law for safety reasons. Rather than chalking up their losses as a strategic business decision gone bad, each seeks to hold the other accountable and so they brought their case to federal court where it was tried in a one-week bench trial. Finding that neither side has proved by its case by a preponderance of the evidence, this case is dismissed.

### Facts Presented

A. Concept and Negotiation of the Track Lease Agreement

Ted Johnson, a consultant in the advertising industry, conceived of the railcar advertising that ultimately led to the Track Lease Agreement, the contract between FTA and CRL that is the subject of this suit. Johnson first conceived of advertising on railcars in 2004. (Tr. at 60). In pursuing such an option, Johnson formed a company called Freight Train Media. (Tr. at 62).

Johnson and his colleagues at Freight Train Media contacted both the American Association of Railroads (the "AAR") and the Federal Railroad Administration (the "FRA") about the idea and made presentations about attaching advertisements to the sides of railcars. (Tr. at 63). According to Mr. Johnson, both organizations thought that advertising on railroad cars would be permissible under federal railroad statutes, provided that the railcars were not "interchanged" – i.e., moved between railroad companies, which would violate of the AAR's regulations. (Tr. at 65-66). Johnson also thought that federal law, rather than state or local law, would govern railway advertising as it did other aspects of railroads, and nothing he learned from the railroad organizations suggested anything to the contrary. (Tr. at 66).

Johnson engaged with Florida East Coast Railroad in 2007 to test railway advertising in Florida. (Tr. at 68-70). Ads ran on Florida East Coast Railroad railcars from April through October 2007 without complaints or challenges from state or local authority, notwithstanding that Freight Train Media did not acquire any permits to run the ads from any state or local authorities. (Tr. at 69-70). The railcars in the Florida East Coast Railroad engagement were cars in motion, although the cars might be stationary for long periods of time while they were not in use. (Tr. at 115). While the trial was a success, Johnson reached two conclusions as a result of the trial: first, that the federal rule preventing advertisement on an interchanging car made valuation of ad space difficult, and second, that the dimensions of a railcar made ad construction difficult. (Tr. at 71). Mr. Johnson determined that a billboard-type advertisement mounted on a shipping container on a railcar would be more profitable and also avoid restrictions on railcar interchange that were limited to the car itself rather than the container/ billboard atop the car. (Tr. at 70-71, 123-24). Johnson inquired of a board member of the AAR whether a container atop a railcar would be violative of Rule 84, and the AAR member responded that in his opinion

it did not violate the AAR manual, although he made no comment about federal, state or local laws or regulations. (Tr. at 121-22). Johnson did not inquire of the FRA. (Tr. at 124). Johnson proceeded to engage Formetco, a leading designer of billboards, to design a billboard that could be mounted onto a railcar. (Tr. at 74-75).

Raymond Sipperley, co-owner of FTA, first met Johnson at an outdoor advertising trade show in fall 2008. (Tr. at 75-76). Johnson presented to Sipperley his concept of utilizing railcars for displaying advertising together with the results of his preliminary research and due diligence as to whether such advertising would be legal. (Tr. at 76). Johnson and Sipperley decided to work together to pursue other railway car advertising opportunities throughout the United States. At the time the two decided to work together, Sipperley was clear with Johnson that any billboard advertisement, while affixed to a rail car on a rail track, would be a stationary item that would not part of a moving train and would not be intended to be moved. (Tr. at 77).

In December 2009, Johnson met with Ken Koff of CRL and discussed the use of railcars on CRL rail lines for displaying advertising. (Tr. at 79-80). At that meeting, Johnson presented the results of his preliminary research and due diligence and the results of the six-month Florida test run to Koff. (Tr. at 79-81). Koff expressed that CRL was interested in the idea of utilizing railcars on CRL rail lines for displaying advertising to generate revenue for CRL. (Tr. at 79-81; 319) On March 12, 2010, Koff and Adam Hess, the director of real estate for CRL's management company OmniTrax, had a conference call with Sipperley and Johnson during which the following subjects were discussed: the use of railcars for displaying advertising; Johnson's past experience in Florida with railcar advertising and its application to stationary railcars; potential CRL property suitable for displaying advertising; and CRL's strong interest in the potential revenue generation from using railcars for displaying advertising on CRL rail lines.

(Tr. at 81-85, 318-19). Mr. Johnson did not remember either Mr. Koff or Mr. Hess at any time suggesting concern about federal vs. state or local jurisdiction over the railcars. (Tr. at 90-91).

In May of 2010, Sipperley and Johnson met with Hess in Chicago to review two potential sites on CRL rail lines suitable for displaying advertising. (Tr. at 87-88). They agreed that CRL's bridge property crossing the Dan Ryan Expressway, known as the "Root Street Wye," had potential for displaying advertising on rail cars. (Tr. at 88, 320). As soon as the site was decided upon, all parties focuses on the fact that this new form of advertising was likely to bring legal challenges. (Tr. at 320-21). Johnson testified that the form of the agreement was critical; if the agreement were a billboard agreement it might fall under state and local laws and regulations, but an agreement premised on the use of a railcar would fall under federal jurisdiction. (Tr. at 93-94). Hess agreed that the form of the agreement was important and a track lease agreement a good choice, and also agreed that building a separate spur track for the signage car would give the Mobile Signage Unit (the "MSU") a better argument for federal preemption (Tr. at 91, 322-23).

On May 18, 2010, Johnson sent a written summary of his research regarding the legality of utilizing railcars for displaying advertising to Hess. (Tr. at 94-95; Joint Exhibit 1). Johnson thought that a challenge from Cook County or Chicago was possible and thought it important that all parties be aware of the research. (Tr. at 96). Hess advised Johnson by email dated May 27, 2010 that CRL would obtain an attorney to look into the best defense for CRL regarding the municipal codes and the federal railroad regulations. (Tr. at 96-97; FTA Ex. 10). According to Johnson, subsequent conversations between him and Hess gave Johnson the impression that Hess' attorneys had gotten comfortable with Johnson's research and agreed that federal rather than local regulations would govern the stationary railcar advertisement. (Tr. at 97).

On May 25, 2010, Sipperley sent a written proposal to Hess to lease CRL's property for displaying advertising. (FTA Ex. 9). Mr. Brad Berkley, a part owner of FTA, then also known as Radiant Outdoor, was integrally involved in the negations with Hess about the written proposal. (Tr. at 173). The proposal referenced length of the lease, guaranteed minimum rent, the revenue share of advertising revenue between FTA and CRL, and the fact that the MSU would need to be moved periodically for CRL to conduct rail business. (Tr. at 491-20; FTA Ex. 9). The written proposal contains no reference to FTA maintaining the right to defend against suits. (FTA Ex. 9). But according to Berkley, the right to "fight and defend" against legal challenges to any kind of alternative advertising is the "single most important thing" to the advertising company, because alternative advertising is generally subject to challenge at multiple levels of government. (Tr. at 173-74). Sipperley also testified that it was critical, a "cornerstone" to the agreement, that FTA have the ability to defend legal challenges and that discussions about the ability to defend were frequent between himself and Hess. (Tr. at 386-87; 397-98). Berkley and Sipperley discussed rights to defend and corresponding indemnification of CRL's costs to defend on multiple occasions with Hess. (Tr. at 174, 386-87). Berkley testified that FTA would not have entered into the Track Lease Agreement without explicitly preserving FTA's right to defend against suits. (Tr. at 176).

In June 2010, CRL prepared the first draft of the Track Lease Agreement, which was largely, but not entirely, the standard template at CRL for a track lease agreement (Tr. at 138, 324-25). Hess sent the first draft to Sipperley and Johnson by email on June 16, 2010. (Tr. at 138; FTA Ex. 12). While CRL's initial draft was largely the standard form for track leases, the initial draft contained deal-specific drafting in Section 4.3 stating that lessee (FTA) would be responsible for obtaining all applicable permits for the maintenance and operation of the track

without expense to lessor (CRL), and that lessee FTA would comply with all laws, ordinances, and directives of any federal, state or municipal government, "including, without limitation, regulations and laws found in Chapter 17-12 of the City of Chicago Municipal Code and in the Illinois Highway Advertising Control Act of 1971, collectively, laws, and other lessor requirements relating to the use of the track." (Tr. at 138-19, 325; FTA Ex. 12.) The initial draft also contained language in Section 1.3 allowing for termination of the agreement without cause upon five days written notice in the event that the use of the track violated the "Laws" defined in Section 4.3. (Tr. at 178).

On June 25, 2010, Ray Sipperley sent his comments on the initial draft to Adam Hess, which included the following business points: that the lease be non-cancelable, and that a provision be added that if it was alleged that the agreement violates laws, FTA must have the right to defend FTA's position against legal and indemnify CRL. (FTA Ex. 13; Tr. at 395-96). Berkley testified that during negotiations with Hess, he and Sipperley made quite clear to Hess that the right to defend a challenge was necessary and therefore the five day termination period needed to be altered. (Tr. at 178). Berkley and Sipperley both testified that the right to defend necessarily required the MSU to be in place while the challenge was defended, (Tr. at 178, 386, 395), but the contemporaneously sent email containing critical deal points references only the right to defend/obligation to indemnify, not the location of the MSU during such challenges. (FTA Ex. 13). Hess responded that FTA should propose language to alter Section 1.3 and that he agreed with the defense/indemnification in concept and would confirm it with his lawyers.

By the final version of the Track Lease Agreement, the termination notice period of Section 1.3 had been extended to 60 days. (Tr. at 184; Joint Ex. 2). The obligation of FTA in Section 4.3 to obtain permission and permits with respect to the MSU had been removed, but the

obligation of FTA to comply with all laws and regulations had otherwise remained as originally drafted. (FTA Ex. 12, Joint Ex. 2). With respect to defense and indemnification, by the final version of the Track Lease Agreement the parties had added a Paragraph 8 in which FTA agreed that it assumed all risk, liability and obligations with respect to complying the "Laws" and agreed to indemnify CRL for all costs of alleged or actual violation of those Laws. (Joint Ex. 2).

B. <u>The Track Lease Agreement</u>

On August 27, 2010, FTA and CRL executed the Track Lease Agreement. (Joint Ex. 2). Under the Track Lease Agreement, CRL would be compensated for leasing the Track to FTA by a monthly rental payment as well as 30% of the net profits obtained by FTA for renting the MSU for advertisements. (Joint Ex. 2 at §§ 3.1, 3.2).

Several sections of the Track Lease Agreement are highly relevant to the ensuing dispute. Specifically, Section 4.3 of the Track Lease Agreement provides that FTA

> shall strictly comply with any and all law, by-law, order, ordinance, ruling, regulation, certificate, approval, consent or directive of any applicable federal, state or municipal government, government department, agency or regulatory authority or any court of competent jurisdiction, including, without limitation, those pertaining to environmental matters, advertising and signage, and including, without limitation, regulations and laws found in Chapter 17-12 of the City of Chicago Municipal Code and the Illinois Highway Advertising Control Act of 1971 (collectively, "Laws") and other Lessor requirements related to the use of the Track.

(Joint Ex. 2 at § 4.3). Additionally, Section 8 of the Track Lease Agreement, titled "Government Regulations," discussed legal defense and indemnification and states:

> [FTA] assumes all risk and liability for any costs, obligations or duties with regard to complying with any Laws related to [FTA]'s use of the Track and nearby property. In addition, [FTA] shall defend, indemnify, release and hold harmless [CRL] from any and all costs, obligations, liabilities, duties, fines, penalties, judgment and/or attorneys' fees that [CRL] may incur as a result of addressing or defendant any alleged or actual violation of any Laws related to [FTA]'s use of the Track and associated property. This obligation set forth in this section will survive termination of this Agreement.

(Joint Ex. 2 at § 8). The Track Lease Agreement does not mention, in Section 4.3, Section 8 or anywhere else, that the MSU must stay out on the Track during the pendency of any legal challenges. (Tr. at 425-26).

With respect to CRL's rights to move the MSU, Section 12 of the Track Lease Agreement, titled "Operations Discontinuance," states:

> [CRL] may discontinue operation over the Track and remove it and all connections to it in the event [FTA] fails to materially keep or perform any obligation or stipulation stated in or resulting under this Agreement or if [CRL] is required or authorized by Laws to discontinue operation of the Track or to change its tracks in such a manner as to render it impracticable, in the judgment of [CRL], to continue to operate the Track.

(Joint Ex. 2 at § 12), while Section 16.1, titled "Operations," states:

> [CRL] agrees to operate said Track for the purpose of serving [FTA], subject to any lawful charges that may be made by [CRL] for such services, with the understanding, however, that [CRL] shall not be obligated to operate the Track if it shall be prevented from doing so by acts of God, public authority, riots, labor disputes or any cause beyond its control, or, if in the opinion of [CRL], it becomes unsafe to operate over said Track.

Several provisions provide notice periods prior to termination. Section 1.2 of the Track Lease Agreement permits either party to terminate the agreement upon giving the other party not less than 60 days written notice "if [FTA's] use of the "Track" violates the "Laws," as defined in Section 4.3 of the Agreement". (Joint Ex. 2 at § 1.2). Section 18.1 and 18.2 provide CRL and FTA, respectively, the right to terminate the Track Lease Agreement on 30 days' written notice if the other party has failed to comply with any term of the agreement. (Joint Ex. 2 at §§ 18.1, 18.2).

C.  Implementation of the Track Lease Agreement

As contemplated by the Track Lease Agreement, FTA constructed a spur track on the Property (the "Track") and constructed the MSU. (Tr. at 186-88; FTA Ex. 35). Construction of

the Track cost approximately $80,000. (Tr. at 188, FTA Ex. 35). FTA contracted with a company called Formetco to design and construct the MSU. (Tr. at 192). The railcar underlying the MSU was a standard double-stack railcar manufactured by Greenbrier Leasing Company for a cost of approximately $2,380 plus approximately $7,200 in rent. (Tr. at 98-99, FTA Ex. 35, 44). Mounted on top of that were two standard shipping containers purchased for slightly less than $5000 (Tr. at 191; FTA Ex. 50), and designed by Formetco to hold an exterior billboard system with protruding lights at a cost of approximately $50,000. (Tr. at 74-75, 193). In October 2010, FTA paid for studies to be conducted regarding the safety of the MSU, including its wind load tolerances, and the studies concluded that the MSU met all required wind load tolerances. (FTA Ex. 22). FTA paid Sims Engineering approximately $2,800 for the safety inspection. (Tr. at 194-5; FTA Ex. 51). Formetco constructed the MSU off-site and shipped it to Chicago through Reliable Transportation Services for a cost of approximately $8,500. (Tr. at 193, FTA Ex. 46). L.A. COLO assembled the MSU on the Leased Track for approximately $54,000. (Tr. at 188, FTA Ex. 35).

On January 6, 2011, FTA rolled out the completed MSU to its intended location on the Track. (Tr. at 253). FTA did not secure any state or local permits related to the use of the Track or the MSU, and the parties did not contemplate doing so. (Tr. at 391-92). Prior to putting the MSU onto the Track, FTA began soliciting advertising agencies for opportunities to enter into contracts with potential advertisers to advertise on the MSU. (Tr. at 210-11). FTA's preliminary efforts resulted in contacts with multiple potential advertisers that were interested in advertising on the MSU, including negotiation with T-Mobile for a possible six-month term, but there was not yet a signed contract. (Tr. at 211).

CRL presented an expert witness, Robert Orlando, to testify as to the value of advertising on the MSU. Mr. Orlando opined that the State of Illinois is one of the strictest states with regard to signs erected in the right-of-way of an interstate. (Tr. at 488). Given the competitiveness of the outdoor advertising industry, in which Mr. Orlando had significant experience, competitors feel little remorse in alerting the state and local authorities to a potentially illegal sign. (Tr. at 489). Visibility is a key factor in valuing an outdoor advertisement, but he opined that advertisers would be "chilled" if their ad space were exposed as a problematic sign, as well as concerned that signing a contract on a legally questionable sign would take away the opportunity to purchase space on a legal sign and run the risk that the ad would be taken down and not viewed. (Tr. at 489). Advertisers who were concerned about a "tainted" location would tend to shy away from that location. (Tr. at 490). Mr. Orlando was aware of situations in which an advertisement remains standing during a legal challenge, but also opined in that in 99.9 percent of cases, legality of a sign is resolved prior to putting the sign up in the first place. (Tr. at 496).

D. IDOT Challenges the MSU and References the 1961 Agreement

On January 10, 2011, the Illinois Department of Transportation ("IDOT") challenged the placement of the MSU based upon state laws regulating advertising through an email sent by IDOT employee Mike Galgano to FTA's informational email. (Tr. at 198-99, 254, 400-01; Joint Ex. 4). FTA, via Berkley, engaged Patrick Coffey, an attorney at Locke Lord Bissell & Liddell LP, to address IDOT's challenge to the MSU. (Tr. at 200; 401). Pursuant to the Track Lease Agreement, CRL was informed of Coffey's retention and that FTA was actively defending the IDOT challenge. Galgano informed Coffey, in an email dated January 18, 2011 that the basis for IDOT's challenge was 225 ILCS 440/10. (Joint Ex. 4). Berkley forwarded the IDOT email to

Hess on January 18, 2011, and Hess agreed that the IDOT statutory allegations were invalid because the MSU was exempted from those statutes. (Joint Ex. 4; Tr. at 335). Coffey drafted a response to IDOT that it was FTA's position that displaying advertising via the MSU on the Track was entirely legal, and Hess both commented on the language before it was sent. (FTA Ex. 27). Coffey responded to Galgano in writing on January 20, 2011. (Joint Ex. 5). Galgano responded on January 21, 2011 with specific refutations of each of Coffey's legal points. (Joint Ex. 6). To Berkley's knowledge, there were no further communications between FTA and IDOT after the January 21 email. (Tr. at 269).

On January 28, 2011, IDOT employee Andy Rabadi sent Hess a single, poorly copied page from a 1961 Agreement between IDOT and the Chicago River and Indiana Railroad Company and the New York Central Railroad Company ("the 1961 Agreement") and requested that the MSU be removed in compliance with the terms of the 1961 Agreement. (FTA Ex. 38). IDOT contended that the 1961 Agreement prohibited the erection of any signs for advertising purposes on the bridges that were to be constructed pursuant to the 1961 Agreement. This was the first time that Hess, and to his knowledge anyone else at CRL, had any knowledge of the 1961 Agreement or that it could interfere with the placement of the MSU. (Tr. at 360-61). Hess did not share the January 28, 2011 email or the purported existence of the 1961 Agreement with FTA until February 10, 2011. (Joint Ex. 10, Tr. at 204, 338-39). Hess stated that he did not do so because until February 10 he had only one illegible page of the 1961 Agreement and had no idea what the rest of the document contained or even who was party to it. (Tr. at 338-39). When he received the complete copy on February 10, 2011, he forwarded it to FTA that morning and requested a call with FTA to discuss it. (Joint Ex. 10). Sipperley testified that had FTA known that the 1961 Agreement applied, it was not something that FTA would have agreed to defend

without doing more due diligence as they had with other aspects of the project prior to entering the Track Lease Agreement (Tr. at 405).

The parties agree that no copy of the 1961 Agreement was recorded in Cook County. (Tr. at 461).  According to the testimony of Mr. Aro Spiros, a railroad real estate consultant engaged by CRL following the commencement of this case, the Chicago River and Indiana Railroad Company (one of the parties to the 1961 Agreement), was owned by New York Central railroad.  In 1968 the New York Central Railroad merged with the Penn Central Railroad. (Tr. at 466-72).  In 1970 the Penn Central Railroad went bankrupt, along with several other railways, and in 1973 the United States stepped in to form Conrail.  (*Id.*) The United States proposed guidelines for failing railroads to join Conrail in the United States Railway Act of 1973. (*Id.*, CRL Ex. 5). As part of that Act, Chicago River and Indiana Railroad Company transferred some of its property, although it is unclear which properties transferred through the Act or to which organizations. (*Id.*).  Based on the recorded deeds in Illinois, it appears that the Root Street Wye was one of the properties transferred from the Chicago River and Indiana Rail Company to Conrail. (Tr. at 476, CRL Ex. 1).  Conrail then quitclaimed the deed to CRL.  (Tr. at 477, CRL Ex. 2).

FTA did not initiate any proceedings, at any time, against IDOT regarding the MSU, the allegations regarding 225 ILCS 440/10, or the 1961 Agreement.  (Tr. at 447).

E.  The IDOT Grant

Almost immediately following receipt of the January 10, 2011 IDOT message sent to FTA, management within CRL expressed concerns internally that the Track Lease Agreement might impact CRL's pending application for a multi-million dollar railway grant (the "IDOT Grant").  (Tr. at 333).  CRL had applied for the IDOT Grant, to be used for track improvements,

in 2008.  (Tr. at 328; FTA Ex. 1).  Hess had known about the IDOT Grant at the time he conducted the negotiation of the Track Lease Agreement, but did not think it was relevant to the negotiations as infrastructure grants are a routine part of the railroad business and come from a variety of governmental entities.  (Tr. at 369-70).  No one at FTA asked him about grants during the negotiations and, had they done so, he would not have concealed the IDOT Grant's pending application.  (Tr. at 369-70).

Hess admitted that on January 16, 2011, his supervisor Mr. Peters told him that Hess would need to be direct with FTA that if the Track Lease Agreement and the IDOT Grant came into conflict, the IDOT Grant would be CRL's priority.  (Tr. at 333).  Hess admitted that at no point in the discussions about Mike Galgano's email with a statutory challenge to the MSU did Hess advise anyone from FTA about the issues concerning the pending IDOT Grant.  (Tr. at 336).

On January 31, 2011, IDOT employee Gabriela Cleveland informed FTA that the dispute regarding the MSU could interfere with the IDOT Grant. (Joint Ex. 7).  IDOT informed FTA that no funds would be received by CRL on the IDOT Grant if CRL were in violation of any state statute and IDOT believed the MSU to be a violation.  (Joint Ex. 7).   On February 9, 2011, IDOT employee Gabriela Cleveland left a voice message for Coffey again referencing the pending IDOT Grant and demanding that the sign be removed within 24 hours.  (Joint Ex. 8).  Coffey responded to Cleveland the same day by phone, and to Sipperley's knowledge received no further reply.  (Tr. at 402-03).

Hess, in his February 10, 2011 conversations with Berkley and Sipperley about the 1961 Agreement, did not mention the IDOT Grant because he was "waiting for it to play out."  (Tr. at 206, 337).  Berkley testified that Hess told him at some point after February 28, 2011 that no

matter what kind of challenge FTA made to IDOT or the City's challenges, CRL would not put the MSU back onto the track until CRL received its IDOT grant and that the timeframe for the grant was unknown. (Tr. at 210-11).

F.  The City of Chicago Challenges the MSU

On February 10, 2011, the City of Chicago Building Commissioner and General Manager Mike Shore of CRL met to discuss the MSU. (Tr. at 340, 537).  Hess did not know about the meeting and did not attend it.  (Tr. at 340-41).  The meeting was not planned; Shore was informed that four men from the City Building Commissioner requested an immediate meeting. (Tr. at 537).  At the meeting, the City of Chicago made clear to Shore that the MSU needed to be removed because the City viewed it as unsafe and that if he did not remove it he would be taken into custody.  (Tr. at 539).  Following the meeting on February 10, 2011, the City Building Commissioner sent an Emergency Vacate Order to CRL stating that the MSU was a threat to public safety and needed to be removed from the Leased Track immediately.  (Joint Ex. 9). Specifically, the Emergency Vacate Order stated that by the powers vested in the Commissioner under the Chicago Municipal Code, the Commissioner found:

> the sign, electrical appurtenances, and metal enclosures currently suspended over the Dan Ryan Expressway on the Chicago Rail Link property at or near the Pershing Road overpass constitute an immediately dangerous and hazardous threat to the public roadway, to the multitude of vehicles using the expressway and the public at large … I further find that the solar panel array and electrical system connected to said sign constitute an electrical safety hazard to the public, that it remains accessible to unsuspecting citizens, having previously been accessed by graffiti artists, who have made apparent physical contact with the sign, appurtenances and enclosures, thereby endangering their health and safety. … Therefore, by the police powers invested in me as the City of Chicago Building Commissioner, I hereby order that the sign, electrical appurtenances and steel enclosures housing said electrical system be immediately removed from the property and stored upon other Rail Link property in an enclosed location to ensure that the public cannot make contact with the offending structure.

Joint Ex. 9.  Shore engaged in discussions internally the next day about how to remove the car from the track.  (Tr. at 553, FTA Ex. 33).  Since the Building Commissioner had threatened to take Shore into custody if the sign was not removed, Shore contacted his legal department first in order to find out what to do about the order. (Tr. at 556-57).  Shore understood that the few day delay between receipt of the Emergency Vacate Order and the movement of the MSU off the Track was due to weather because a heavy snowfall had recently occurred and CRL was busy cleaning the rails.  (Tr. at 545).  Hess was not party to any conversations within CRL about what to do regarding the Emergency Vacate Order. (Tr. at 358-59).  No one from CRL told FTA about the February 10, 2011 meeting, the Emergency Vacate Order, or the fact that the railcar had been deemed unsafe by the City (Tr. at 342).  No one from CRL shared FTA's safety data with the City. (Tr. at 344-45).

      G.  <u>FTA Issues CRL A Notice of Termination of the Track Lease Agreement</u>.

On February 14, 2011, FTA issued a demand letter to CRL that CRL made material misrepresentations to FTA during the negotiation of the Track Lease Agreement when CRL failed disclose the 1961 Agreement and that CRL owed FTA $230,000 in damages.  (Joint Ex. 11).  The letter also stated that the letter constituted FTA's notice under Section 18.2 of the Track Agreement of FTA's right to terminate the Track Lease Agreement after 30 days. (Tr. at 243-44, 359-60; Joint Ex. 11).  FTA never sent a separate termination letter following the passage of the 30 day period, but Berkley testified that the demand letter was intended to serve as a notice of termination of the Track Lease Agreement.  (Tr. at 244).  Hess testified that it was his understanding that FTA terminated the Track Lease via the February 14, 2011 letter.  (Tr. at 360).

H. <u>The MSU is Removed From the Track.</u>

CRL moved the MSU off the Leased Track and onto a track a short distance of way, obstructed from view by bushes. (Tr. at 346). CRL did not enclose it to prevent access. (Tr. at 346). Hess testified that he did not believe the MSU to be dangerous over and above the general dangers associated with any railcar. (Tr. at 346-47).

On or about February 23, 2011, after the MSU had been removed from the Track, FTA independently discovered that the MSU had been removed from the Leased Track without its authorization. CRL forwarded FTA the Emergency Vacate Order on February 28, 2011. (Tr. at 245, 343). Sipperley had been previously contacted by a Chicago Building Commissioner's Office representative on February 10, 2011, but the inspector merely asked for some details about the MSU system and gave no indication that the MSU needed to be removed. (Tr. at 409). The February 28 email was the first time that Sipperley learned of the Emergency Vacate Order. (Tr. at 408-09). In conversations in the days following the February 28 email, Hess told Sipperley that the IDOT Grant would take precedence over fighting the Emergency Vacate Order and that the MSU would not be placed back out on the track. (Tr. at 416). FTA did not raise any challenge to the City or the Emergency Vacate Order at any point. (Tr. at 245, 416-17). Sipperley agreed that the FTA could have challenged the Order at any time but did not do so because FTA believed that CRL would not let the MSU back on to the track so any such challenge would have been fruitless in light of CRL's concern about the IDOT Grant. (Tr. at 453-54).

Also, on February 23, 2011, IDOT attorney Cleveland emailed CRL to confirm that the MSU had been moved so that the IDOT Grant could be processed. (FTA Ex. 38). Hess confirmed the MSU had been moved. (*Id.*) Cleveland testified that if the MSU had not been

removed IDOT would have either taken it down or sued to have it removed. (Tr. at 524-25). In order to initiate suit, IDOT would have to go through the State Attorney General's office, and request that they take legal action under the theory that illegal signs threaten the State of Illinois' ability to receive federal road money for the benefit of the state. (Tr. at 525).

On February 28, 2011, Hess advised FTA that the MSU had been removed due to the City's order, and forwarded Berkley and Sipperley a copy of the Emergency Vacate Order. (Joint Ex. 12).

The IDOT grant was disbursed in April 2011. (Tr. at 368). The MSU remained in the location where it had been moved on February 15, 2011, a few hundred yards from the Root Street Wye, for 17 months. (Tr. at 368).

## Discussion

### A. Breach of Contract by CRL

To recover on its claim for breach of contract against CRL, FTA must establish: (1) the existence of a valid and enforceable contract; (2) FTA performed, or was excused from performing, its obligations under the contract; (3) breach of the contract by CRL; and (4) that FTA suffered a resultant injury. *Henderson-Smith & Assoc., Inc. v. Nahamani Family Service Center, Inc.*, 752 N.E. 2d 33, 43 (Ill. App. 2001).

*1. The Track Lease Agreement was a Valid and Enforceable Contract.*

Courts must construe contracts to give effect to the reasonable expectations of the parties to the contract. *See GNB Battery Technologies, Inc. v. Gould, Inc.,* 65 F.3d 615, 621–22 (7th Cir. 1995) (citations omitted). To preserve such expectations, the contract is considered in its entirety. *Id.* at 622. "If it is determined that the relevant documents are unambiguous, the court need not consider the trial parol evidence, and should give the plain meaning of the documents

effect without resorting to rules of contract construction." *Id.* But "where the terms of the agreement itself are not clear, or are ambiguous, the court will construe the contract to determine and give effect to the intention of the parties … at the time they entered into the contract." *Harris Trust & Sav. Bank v. Hirsch*, 445 N.E.2d 1236, 1239 (Ill. App. 1983) (citing *Cedar Park Cemetary Assoc., Inc. v. the Village of Calumet Park*, 75 N.E.2d 874, 880 (Ill. 1947)); *see also Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir.1989).

The Track Lease Agreement is clear on its face that FTA had the obligation to address and defend against legal challenges to the MSU. In particular, Section 4.3 of the Track Lease Agreement required FTA to "strictly comply" with any applicable law, ordinance, or regulation of any applicable state, federal or municipal government. Section 8 of the Track Lease Agreement mandated that FTA had the obligation to defend and indemnify CRL from "any and all costs, obligations, liabilities, duties, fines, penalties, [or] judgments" that resulted from FTA addressing or defending "any alleged or actual violation of any Laws related to [FTA's] use of the [Leased] Track." *See Progressive Publ. Inc. v. Capital Color Mail, Inc.*, 500 F. Supp. 2d 1004, 1006 (N.D. Ill. 2007) (holding that the use of the word "shall" in private contracts denotes a mandatory requirement).

Less clear from the plain language of the Track Lease Agreement is whether the obligation on the part of FTA was an obligation considered favorable by FTA and bargained for. Based on the language of the Track Lease Agreement together with the conduct of the parties during the negotiation of the contract, the Court finds that the parties specifically negotiated the challenge, defense, and indemnification clauses of the Track Lease Agreement as material portions of the Track Lease Agreement. As shown by the testimony of Sipperley, Berkley, and Hess, the parties expected that the MSU would provoke legal challenges by governmental

authorities that would need to be addressed. In particular, Sipperley, Berkley and Hess contemplated that the nature of the challenges to the MSU would not be known until the MSU was placed on the Track, such that applying for permits/permission prior to erecting the MSU would not be sufficient or effective in bringing any governmental challenges to light. Additionally, FTA, through Sipperley and Berkley, wanted to take the lead in defending against those challenges, while CRL, through Hess, bargained for the indemnification embodied in Section 8 of the Track Lease Agreement in exchange for giving FTA the lead role it desired.

Therefore, the Court finds that the parties entered into a valid and enforceable contract that contemplated the defense of challenges to the MSU be lead by FTA in exchange for FTA's indemnification of CRL for any expenses incurred in connection with those challenges.

2. *FTA performed its obligations under the Track Lease Agreement until the delivery of the February 14, 2011 Letter.*

The testimony provided by the parties shows that prior to the removal of the MSU from the Track and the delivery of FTA's letter on February 14, 2011, FTA had performed its obligations under the terms of the Track Lease Agreement. FTA constructed the MSU and conducted safety tests on the structure. FTA moved the MSU out onto the Track. And after IDOT issued its challenge, FTA hired an attorney and commenced defense of the challenge. The parties are in agreement that FTA did not know about the February 10, 2011 meeting with the City or the Emergency Vacate Order. Therefore, FTA cannot be said to have failed to defend a challenge that it knew nothing about.

On February 14, 2011, however, FTA issued the February 14, 2011 Letter. (Joint Ex. 9). FTA argues that it did not actually terminate the Track Lease Agreement but only issued a notice of intent to terminate the Track Lease Agreement. However, Berkley testified that FTA intended the February 14, 2011 Letter to be a termination letter. The timing of the removal of the MSU

on February 15, 2011 appears to have been coincidental, but both parties stopped performing under the Track Lease Agreement at the same time. The record shows that the February 14, 2011 Letter was intended to be, and was received as, a termination of the Track Lease Agreement 30 days hence. As there was no point in continuing legal challenges to the MSU for a Track Lease Agreement that would soon not be in force, it comes as no surprise that FTA did not continue to pursue legal actions.

> *3. FTA did not meet its burden to show that CRL materially breached the Track Lease Agreement and thereby excused future performance by FTA.*

FTA alleges that CRL materially breached the Track Lease Agreement in several ways: 1) removing the MSU from Track following the City's Emergency Vacate Order without either obtaining FTA's permission or providing sixty days' notice to CRL; 2) failing to allow FTA to address and defend against the City and the Emergency Vacate Order; and 3) failing to allow FTA to meaningfully and fully address the IDOT legal challenge. Notably, FTA has alleged that these breaches are material breaches. A material breach of the terms of a contract will excuse the other party from its duty of counter-performance. *Elda Arnhold and Byzantio, LLC v. Ocean Atlantic Woodland, Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) ("[A] material breach of the terms of the contract will serve to excuse the other party from its duty of performance"); *Arnhold*, 284 F.3d at 700, citing *Finch v. Illinois Cmty. Coll. Bd.*, 734 N.E.2d 106 (Ill. App. 2000).

Under Illinois law, the materiality of a breach "focuses on two interrelated issues: (1) the intent of the parties with respect to the disputed provision; and (2) the equitable factors and circumstances surrounding the breach of the provision." *Arnhold*, 284 F.3d at 700. The first element requires the fact finder to determine whether "the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it." *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 715 (7th

Cir. 1993); *see also Arnhold*, 284 F.3d at 700. The course of negotiations among the parties is relevant to the parties' intent. *See id., see also Sahadi v. Continental Illinois Nat. Bank*, 706 F.2d 193, 197 (7th Cir. 1983). The second element requires the fact finder to "take into account the totality of the circumstances and focus on the inherent justice of the matter." *Arnhold*, 284 F.3d at 700. The focus should be on factors such as "whether the breach defeated the bargained-for objective of the parties; whether the non-breaching party suffered disproportionate prejudice; and whether undue economic inefficiency and waste, or an unreasonable or unfair advantage would inure to the non-breaching party." *Id.* (citing *Arrow Master*, 12 F.3d at 715).

### i. Removal of the MSU

As stated above, the testimony shows that the parties bargained for FTA's right to defend legal challenges to the MSU in exchange for indemnification of CRL. But FTA's argument that CRL breached the Track Lease Agreement when it moved the MSU off the Track and did not give FTA notice under Section 1.2 necessarily requires that Sections 4.3 and 8, together with Section 1.2, be read to contain an additional requirement not stated by the plain language of the Track Lease Agreement: namely, that FTA had the bargained-for right to defend against challenges *while the MSU remained in place* atop the Root Street Wye. Sections 4.3 and 8 place the duty to comply with the Laws and defend challenges against the legality of the MSU squarely upon FTA but say absolutely nothing about the location of the MSU during those challenges. To the contrary, Section 16.1 expressly leaves the operation of the Track – upon which the MSU rests – in the control of CRL and removes CRL from any obligation to operate the track if it shall be prevented from doing so by acts of "public authority" or "if in the opinion of [CRL], it becomes unsafe to operate over said Track." Track Lease Agreement at §16.1.

FTA did not meet its burden at trial to show that the location of the MSU during the pendency of a legal challenge was a critical component of the negotiations. FTA attempts to make the continued presence of the MSU on the Track during the pendency of a legal challenge a material breach by arguing that the purpose of the Track Lease Agreement was to generate advertising revenue and advertising revenue could not be raised without the MSU on the Track. But FTA did not meet its burden to show through testimony and evidence at trial that the parties ever discussed a difference in advertising revenue between the MSU remaining on the Track during a challenge or off the Track, nor did FTA provide any evidence that the advertising revenue would in fact have been greater had the MSU been on the Track during the challenge. To the contrary, Mr. Orlando, an expert witness for CRL, gave unrebutted testimony on behalf of CRL that would-be advertisers on outdoor signage are a risk-averse bunch who will not enter into a contract when the legality of advertising space is in question, since signing such a contract necessarily means giving up the opportunity to put the same advertisement nearby on a legally "safe" board.

The testimony elicited at trial also showed that the parties wanted to put the MSU on the Track first and use the MSU to trigger challenges, rather than seek permits in advance of building the MSU. The testimony further showed that the parties erected the MSU as planned, and succeeded in triggering the anticipated legal challenges of IDOT and the City. But FTA did not meet its burden to show that it was a bargained-for provision that the MSU must remain in its place on the Track after the legal challenges occurred. Since the movement of the MSU off the Track in response to a directive from a public authority was explicitly authorized by Section 16.1 and since FTA did not meet its burden to show that the parties intended the MSU to remain on the Track during defense, the movement of the MSU off the Track is not the same as termination

of the Track Lease Agreement and not a breach of the sixty-day notice requirement in Section 1.2.

### ii. Failure to Notify FTA of the February 10, 2011 City meeting and the Emergency Vacate Order

FTA next argues that CRL breached the Track Lease Agreement when it failed to notify FTA, as it was required to do for indemnification claims under Section 13.1(c) of the Agreement, of the emergency meeting between the City and CRL on February 10, 2011 and the Emergency Vacate Order issued by the City later that same day. It is undisputed that CRL did not notify FTA of the meeting or the Emergency Vacate Order until February 28, 2011, after the point at which the MSU had been removed. As an initial matter, there was no testimony before the Court that CRL attempted to claim indemnification for the Emergency Vacate Order, so the Court is not convinced that FTA could stand on Section 13.1(c) alone. However, even if failure to tell FTA about the meeting and the Order constituted a breach of the Track Lease Agreement, the breach is not a material one that would absolve FTA of its obligation to perform its obligation to defend against challenges to the MSU, for the same reasons set forth above with respect to the removal of the MSU in the first place. FTA has not met its burden to show that the MSU's continued placement on the Track during the pendency of a legal challenge was "of such a nature and of such importance that the contract would not have been made without it" to satisfy the first prong of a material breach inquiry. *See Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 715 (7th Cir. 1993).

Even if FTA were to satisfy the first prong, it could not satisfy the second prong of the materiality inquiry, whether FTA suffered disproportionate prejudice from the breach. The Court made several attempts to elicit testimony from the parties as to the negative effect of CRL's delay in telling FTA about the Emergency Vacate Order, such as the waiver of a

mandatory period of appeal. No such information was provided. To the contrary, Sipperley testified that FTA could have challenged the safety ruling of the City "at any time." In bringing the MSU onto the Track, the parties triggered the expected challenge by the City; there is nothing in the record that suggested FTA could not have pursued its response to the challenge regardless of whether the MSU was replaced on the Track or not. The testimony of record shows that FTA decided that pursuing the claim would be futile in view of CRL's stated position that it would protect the IDOT Grant, but that decision was FTA's. In contrast, the testimony of Mike Shore, the CRL employee who participated in the February 10, 2011 meeting with the City, faced the very real and immediate threat of being placed into custody if he did not remove the MSU as directed by the City in the Emergency Vacate Order.

### iii. Failure to Allow FTA to Continue the IDOT Challenge

FTA next argues that CRL breached the Track Lease Agreement when it failed to notify FTA of the IDOT Grant and thereby impeded FTA's response to the IDOT challenge. By Hess' own admissions, he knew about the IDOT Grant as early as January 16, 2011, but never said anything to Sipperley or Berkley about the existence of the IDOT Grant or about the position within CRL that the IDOT Grant should take precedence over keeping the MSU out on the Track. However, FTA's claim for breach stemming from the IDOT Grant fail for the same reason as do the claims related to the City's position and to the removal of the MSU in that it is premised on a contractual obligation to keep the MSU on the Track during the pendency of any challenge. By the admission of attorney Cleveland of IDOT, the IDOT Grant had been placed in peril by the fact that the MSU did not comply with a state statute. FTA was in the process of challenging IDOT's position that the MSU did not comply with the statute they cited. Had FTA continued this challenge, which was already in progress, they might well have prevailed and

thereby removed any conflict between the MSU's position on the Track and the IDOT Grant. But since FTA noticed its intent to terminate the Track Lease Agreement, neither of the parties reached a point where the IDOT Grant was fully at issue. Without having reached such a point, FTA did not meet its burden to show breach, let alone material breach, by CRL.

4. *CRL's counterclaim for breach of contract also fails.*

CRL counterclaimed for breach of the Track Lease Agreement by FTA because FTA failed to comply with all Laws as required in Section 4.3. But as discussed above, based on the facts presented at trial FTA's right to defend against legal challenges brought against the MSU was a crucial element of the Track Lease Agreement, making CRL's argument that FTA breached by failing to obtain pro-active permits for the MSU untenable. Given that FTA was performing under the terms of the Track Lease Agreement by actively responding to the IDOT challenge, CRL presented no other evidence to the Court of a failure on FTA's part until after the time FTA delivered the February 14, 2011 letter. CRL took the position, by way of defense to the charges of breach of contract brought against CRL, that the February 14, 2011 Letter (Joint Ex. 9) was FTA's notice of intent to terminate the Track Lease Agreement. Having taken such a position and prevailed on that position before this Court, CRL cannot also argue that FTA breached the Track Lease Agreement by failing to continue performance of the duties of defense after it had delivered notice that the Track Lease Agreement would terminate in 30 days. Having shown no other evidence of FTA's breach, CRL has not met its burden to prove FTA breached the Track Lease Agreement.

In conclusion, based on the testimony elicited at trial, both CRL and FTA thought they had discovered a loophole between state/local regulations on the one hand, and federal railroad law on the other hand, and all parties were excited to profit from it. The testimony of Sipperley,

Berkley and Johnson, together with the written correspondence during the negotiations, show that FTA would not have entered the Track Lease Agreement if it did not provide FTA the right to address and defend against legal challenges to the Mobile Signage Unit.   But FTA provided no adequate explanation as to why the MSU had to remain on the track during the pendency of the challenges, especially in the face of a safety challenge.   CRL moved the MSU off the Track in response to an Emergency Vacate Order issued by the City on grounds of safety, and FTA has given this Court no basis to disregard the plain language of Track Lease Agreement whereby CRL maintains control over the Track and the operation of the Track when it comes to safety concerns.   Once off the track, FTA could have challenged the Emergency Vacate Order then, and if it succeeded in its challenge, demanded that the MSU be moved back onto the Track.   FTA stands by the position that because Hess stated that would not have allowed the MSU back onto the track until the IDOT Grant issue resolved, the entire contract was voided.   But the MSU being alongside the Track did not prevent FTA from continuing its challenges to the MSU and resolving them while the IDOT Grant issue was simultaneously resolved.

Instead, it seems that FTA, perhaps surprised by the vehemence of the challenges by the city and state, simply threw up its hands and delivered the February 14, 2011 letter notifying termination, stopped the resolution of both issues, and then made no attempt to challenge the Emergency Vacate Order after it was received on February 28, 2011, instead leaving the MSU sitting alongside the Track for months.   But CRL, for its part, also seems to have been surprised by the hornets' nest the Track Lease Agreement had stirred with governmental authorities, and was quick to accept the February 14, 2011 letter as ending the relationship before the challenges could go any further.   Both parties having jumped ship early in the process and simultaneously,

neither can now point fingers at the other for a relationship that simply broke down in the face of obstacles that, if not unforeseen, were unexpected in their force.

### B. The Fraudulent Misrepresentation Claim

To prevail on a claim for fraudulent misrepresentation, FTA must show that CRL made a false statement of material fact, with knowledge that the statement was false or with reckless regard as to its truth, with the intent to induce FTA to enter the Track Lease Agreement, and that FTA relied upon that representation to its detriment. *See Board of Educ. of City of Chicago v. A,C and S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989) (listing elements of a fraudulent misrepresentation claim until Illinois law); *see also Neptuno v. Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 692 N.E.2d 812, 815 (Ill. App. 1998) (same). Misrepresentations need not be known to be false, but may also be made with reckless disregard as to the truth of the assertion. *See Stewart v. Thrasher*, 610 N.E.2d 799, 802 (Ill. App. 1993).

FTA has not met its burden to show by a preponderance of the evidence that CRL materially misrepresented its ability to lease the Track to FTA. First, CRL presented unrebutted testimony that it was unaware of the existence of the 1961 Agreement and that its diligence following IDOT's reference to the 1961 Agreement revealed no public record of the document. CRL cannot be said to have materially misrepresented a real estate issue of which it was not aware and reasonable diligence would not have uncovered as it was not recorded, and which under Illinois law is of dubious enforceability. *See Kovacevic v. City of Chicago*, 365 N.E.2d 104, 107 (Ill. App. 1977) (unrecorded real estate rights are not enforceable against a bona fide purchaser) . Second, since CRL's lack of knowledge of the 1961 Agreement's existence is unrebutted, FTA cannot prove that CRL intentionally misrepresented its lease rights in order to induce FTA to enter into the Track Lease Agreement.

FTA argues that CRL should have contacted IDOT to determine whether it had the right to lease the property to FTA for advertising; that argument, however, is disingenuous when placed beside FTA's contrary argument about IDOT communication in the context of FTA's claim for breach of contract against CRL. In the context of its breach claim, FTA elicited testimony and made argument that the parties deliberately refrained from contacting state and local agencies in advance of signing the Track Lease Agreement and erecting the MSU because the parties wanted to put the MSU onto the Track first and draw reactive challenges rather than seek permission or permits to erect the MSU. FTA cannot now argue that CRL should have sought permits to lease the Track to FTA for purposes of erecting the MSU without undermining its argument that the parties agreed not to be proactive about the signage with governmental authorities.

### C. The Fraudulent Concealment claim

FTA has also brought a claim against CRL for fraudulent concealment of the existence of the IDOT Grant.[1] To prevail on a claim for fraudulent concealment, plaintiff must prove "(1) the concealment of a material fact; (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonably inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury." *Doe v. Brouillette*, 906 N.E. 2d 105, 123-24 (Ill. App. 2009) (quoting *Neptuno*, 692 N.E.2d at 812 (Ill. App. 1998) (internal citations omitted); *see also DOD Techs. v. Mesirow Ins.*

---

[1] During closing argument, FTA conceded that it is no longer pursuing its claim that CRL fraudulently concealed the 1961 Agreement. (Tr. at 606).

*Svcs, Inc.*, 887 N.E.2d 1, 11 (Ill. App. 2008) (same). Mere silence does not amount to fraudulent concealment. *Illinois Cent. Gulf R. Co. v. Dep't of Local Gov't Affairs*, 169 Ill.App.3d 683 (1st Dist. 1988). The failure to disclose may not be merely the passive omission of facts but must have been done with the intent to deceive the other party under circumstances creating an opportunity and duty to speak. *Allensworth v. Ben Franklin Sav. And Loan Ass'n,* 71 Ill.App.3d 1041 (2nd Dist. 1979).

Based on the testimony elicited at trial regarding the IDOT Grant, FTA has not met its burden to prove that FTA intentionally concealed the IDOT Grant from FTA. Hess testified that grants from federal and state agencies for infrastructure are routine in the railroad industry, and FTA provided no contradicting testimony that either party gave any thought during negotiation of the Track Lease Agreement to the potential impact that the MSU and legal challenges would have on pending grants. The record contains no suggestion that during the negotiations of the Track Lease Agreement, individuals within CRL were aware that the IDOT Grant and the Track Lease Agreement might intersect. Deliberate concealment, with intent to deceive, is an essential element of fraud. *See Fox v. Heimann,* 872 N.E.2d 126, 138 (Ill. App. 2007). While CRL's failure to think about this aspect of the Track Lease Agreement may have been an oversight, nothing in the information presented to the Court suggests intent. The potential intersection of the IDOT Grant and the MSU came to light through Gabriela Cleveland's voicemail to FTA's attorney Coffey, not through internal communication at CRL. By the time of that announcement, the Track Lease Agreement had been signed several months prior, the MSU erected and placed on the Track, and FTA was already engaged in defending the IDOT statutory challenge. The record simply contains inadequate factual basis for FTA to prevail on its claim that CRL deliberately concealed the IDOT Grant during the negotiation of the Track Lease Agreement.

## **Conclusion**

Based on the evidence presented to the Court at trial, neither FTA nor CRL met their burden to prove by a preponderance of the evidence the claims alleged against the opposing party. Therefore, this Court rules in favor of defendant CRL as to FTA's claims of breach of contract, fraudulent misrepresentation, and fraudulent concealment, and rules in favor of counter-defendant FTA as to CRL's counterclaim of breach of contract.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: May 31, 2013